We'll hear argument in Johnson v. Advocate Health, No. 163848. Counsel? Good morning, Your Honors. May it please the Court. My name is Arianna Kasarevich, and I represent the plaintiffs' appellants in this case. The plaintiffs have appealed this case for two reasons. One, the District Court misapplied the summary judgment standard when it granted summary judgment to the defendant. Two, the District Court's analysis in ruling on the motion for summary judgment failed to comport with this Court's ruling in Ortiz v. Werner Enterprises. Why isn't Aramark a dependent? Aramark isn't the plaintiff's employer. Advocate is their employer, and under Title VII, we can only bring a case against the employer. Did you try? There was no reason to try. The plaintiffs are employed by Advocate, and Advocate brought in Aramark to run their EVS department. And apart from them simply being there to run the department, Aramark was essentially just an extension of Advocate. It was an agent of Advocate. Advocate controlled everything that Aramark did. Aramark couldn't discipline or fire or promote or give raises to the plaintiffs or to any of the other EVS techs that worked at Advocate without Advocate's approval first. They didn't have this kind of a— I have to go back to your response to my question because I'm uncomfortable with it. You know, there's something called agency. I myself really have been wondering about why Aramark is not a defendant in this case. It seems to me that Aramark was an independent contractor with full authority to hire, fire, and discipline employees under its control. That's an issue that might be a factual one that could be determined if there were a trial. In other words, I'm not really satisfied with your response. I'll try to clean that up a little bit, Your Honor. The question of agency is a factually intensive one, and unfortunately the district court only addressed agency in one footnote. But when it comes to agency, what we look at is how much control Advocate had over Aramark. And Advocate had a lot of control over Aramark and what the Aramark leaders were allowed to do and not allowed to do. Yes, they were there to run the department, but apart from being there to run the department, Aramark could not fire the plaintiffs. Advocate could do that. Aramark could certainly initiate—when I say Aramark, I mean Susan Castillo of Aramark or Chris Skolnick, the leadership from Aramark—could initiate a termination notice, but that would have to get approved by Advocate. Furthermore, if you look at the services agreement between Aramark and Advocate, there are terms in there that further show how much control Advocate actually retained over Aramark. Advocate had the power to remove the Aramark director if it found her to be unacceptable. Advocate could refuse to allow Aramark leaders to perform services if certain requirements weren't met. Aramark leaders who worked at Advocate had to follow Advocate policies and procedures. They had to meet Advocate's performance expectations. So all of those things together suggest that Aramark was an agent, not an independent contractor. It sounds like what you're saying is that all of the employees of Aramark would meet the standard of co-employees under Vance v. Ball State so that Advocate would not be strictly liable, for example, for racially hostile remarks made by Aramark employees, is that right? Well, we believe that Advocate would be strictly liable for the acts of the Aramark leaders because they were the supervisors of the plaintiffs in this case. You just told us, though, that Aramark does not have the right to hire, fire, promote, discipline. That sounds like they're not supervisors under Vance v. Ball State. What am I missing here? There's a little distinction there. Please. And the facts in this case are a little bit interesting when it comes to that point because the Aramark leaders and supervisors, they could get one of the plaintiffs terminated. They have. They've terminated three of our plaintiffs. What they can't do, they can't single-handedly do it. They have to run it by Advocate's HR and get the stamp of approval. There's no Advocate's... How is that different from Vance? Well, the difference here is that the Aramark leaders don't have the full-on authority to fire or to hire or to give raises or promote the plaintiffs or the other EVS techs that work at Advocate. However, upon their recommendation, Advocate gives their stamp of approval. There is... It has to go through Advocate. Could you address this question in terms of Vance itself? Well, what do you mean? Let me read this, okay? We hold that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim. That is, to effect a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. We reject the nebulous definition of a supervisor advocated in the EEOC guidance and substantially adopted by several courts of appeals, petitioner's reliance on colloquial uses of the term supervisor is misplaced. It sounds like you're asking us to adopt that colloquial understanding of supervisor as distinct from what was adopted in Vance. Not quite, Your Honor. While Susan Castillo and the other Aramark leaders were called the supervisors of the plaintiffs, and their names appear on paperwork as the supervisor, they did... For example, Plaintiff Annette Smith was fired. She was fired by Susan Castillo. Susan Castillo, however, before getting... Didn't you just start your argument, counsel, though, by telling us that you didn't sue Aramark because they're not an employer, because they did not have any of these powers? I'm very confused. And I'm trying my best to clear that up. They sort of go hand in hand here. What does? Well, the Aramark leaders did have a certain authority to essentially initiate a termination, initiate a discipline. However, they couldn't just do that without running it by advocate first. Because they did not have that power, right? Well, the evidence here doesn't show or it doesn't support the contention that Aramark didn't have the power. It's just that that was the policy that Aramark, under the services agreement, had to follow. They had to follow advocates' policies, and advocates' policies was that they had to run it by HR. Just as an advocate supervisor from a different department in the hospital, if they wanted to write up or fire an employee, they had to run it through HR at advocate. So ultimately, Susan Castillo is the person who got Annette Smith fired, who got Warren Johnson fired. However, that was approved by advocate. Advocate is the employer here, and that is why advocate was sued. Now, that aside. All right. Would you agree? I'm going somewhere else now. Do you agree that any of the evidence of derogatory name calling was hearsay? I do not. For example. I'd be correct that some of the evidence was that it was the word on the street that Susan Castillo had used a derogatory name. Can you tell me which, if any, of the evidence of derogatory statements and name calling was not based on direct personal knowledge? There is direct personal knowledge of all of the name calling and racially offensive comments that have popped up in this case. Susan Castillo, including one of the plaintiffs, including other EVS techs at advocate have heard Susan Castillo call African Americans monkeys or porch monkeys. Susan Castillo has been heard by various EVS techs, including. Who provided affidavits? Yeah. Fernando Carpintero, who provided a declaration. Susan Castillo specifically reached out. She came up to him and she said, Do you have any people who would want to work at advocate? But please, no blacks. I don't want to hire blacks. They're lazy. She said that to him. He has signed. He has sworn to that statement in his signed declaration. That is an exhibit in this case. And which person was that? Which person? Fernando Carpintero. And who say that? Castillo? Susan Castillo. Yes. You know, there are two examples on page six of your reply that are clearly hearsay. One is Pulaski admitted that it was well known that Castillo made such racially derogatory comments. And another news spread that allegedly Susan Castillo called one of the employees a porch monkey. That is gossip and hearsay. I guess we will have to search through the record for these sorts of things. There are separate pieces of evidence where other employees have first-hand knowledge and have heard Susan Castillo refer to African-Americans as porch monkeys. But you said it's all non-hearsay. That was your response to my question. Well, here's the thing. First, I believe that some of these statements are not hearsay under 801 D2D. Moreover, I believe that... You're talking about the descriptions of people's own pay grades? Well, that too, but any comment... No, that doesn't work, actually. Comments made by an agent of advocate, we believe, are not hearsay. Do you think any gossip within the workplace among employees becomes non-hearsay, admissible against the employer? No, I don't believe that, and I agree with taking it too far. Here's the thing. Michalowski's point about word spread that Susan Castillo was calling African-Americans porch monkeys and that she was using this racially offensive language, that goes to the point of what kind of environment and hostile work environment our plaintiffs and other EVS contacts were living in. You're asking us to ignore the difference between fact and rumor, right? You're saying that rumors are part of the environment. Is that the idea? Well, our plaintiffs worked in that environment every day. Is that what you're telling us, that evidence of rumors becomes evidence of a hostile environment? I'm not saying that evidence of rumors becomes evidence of a hostile work environment. However, it goes to the point. I mean, under Ortiz, we are supposed to consider all the evidence. That does not work. Okay, it's hearsay. Regarding the out-of-court statements of third parties about their salaries, on what basis is that hearsay admissible? In other words, under 801 D2D, the statement is allowed only if the employee's duties encompass some responsibility related to the decision-making process that affected the employment action. So, did the employees who reported their salary to Johnson & Smith have duties related to decision-making processes affecting the employment actions that you're disputing? They did not, and our understanding of 801 D2D was slightly different. We thought, well, it's our position that it's agents of advocate, and they're talking about something relating to their relationship with advocate and within their scope, including which means their pay. This converts rumor and hearsay into evidence. No, that apart, though. It's not something within the chain of their responsibilities to tell other employees what their wage rate is. But that is not the only evidence. I'm sorry, that is not the only evidence of pay discrepancies here. Plaintiffs submitted Plaintiff's Exhibit No. 7 in their response to And it is a printout of all of the EDS techs who work at Advocate, when they were hired, and what they are making. And that list will show you, it speaks for itself, that there are several EDS techs. Lists like that, counsel, rarely speak for themselves. What was the date of that printout? You know, it's not dated, Your Honor. Do you have any evidence as to its date? Do you have any witness who identified it? Do you have an affidavit that authenticates it? Well, it was an exhibit that was produced by the defendant. The fact that a piece of paper is produced in discovery does not mean it is evidence. It rarely means that it's authenticated. The obligations of discovery are so broad that if the piece of paper might be relevant, you have to produce it. It doesn't mean the act of production authenticates it. So what have you got to explain that? Well, there were several HR representatives from Advocate who did testify and they talked about pay... Did they talk about that exhibit? No, this exhibit, granted, was not an exhibit. Can I ask you something else then? Because I don't think that exhibit is going to help you very much. What evidence is there that any of the plaintiffs who are complaining about a denial of a promotion actually applied for a promotion? Well, for instance, Robert Pinnell has testified in his deposition that he has applied. And the way that it works is at Advocate, when a position opens up, for example, a Tech II position opens up, a sign-up sheet is posted at Advocate for anybody who is interested in that position and wants to be considered for it. Robert Pinnell has testified that he has put his name on that kind of a sign-up sheet several times and he has always been overlooked in favor of white employees. For instance, Robert Pinnell has been with Advocate since 1996. So he has been there, and he's still there now. He's been there 21 years. He has plenty of experience in seniority at Advocate and he has expressed his interest in a Tech II position not only by signing his name on the sign-up sheet but also having conversations with Chris Skolnick and some of his other supervisors. Nevertheless, that Tech II position was given to John Mueller who Advocate claims has 20 years of experience and therefore that is why he got it. Well, so does Robert Pinnell. But what John Mueller doesn't have that Robert Pinnell has is seniority at Advocate because John Mueller started there in 2013. The only difference between them is their race. Do you want to save the rest of your time for rebuttal? I would want to ask one question. It's because this isn't brought up much even in this case but this company is substantially integrated. Many of the people working there are black. The court set them apart. I wrote them down, black. Wiley, Smith, Hudson, Addison, Griffin, Jones and many of them were making decisions about other people. Now I don't know, I know that's not really emphasized in this case but it just seems to me this is a pretty well-integrated company. Well, but again the complaints are against With black people making decisions. But again the complaints are against three of the Aramark supervisors who are white. Susan Castillo, Chris Skolnick, and Mike Michalowski. And they are the ones who have discriminated against the African-American EBS techs including the plaintiffs herein. Moreover, I believe Actually, I will reserve the rest of my argument for rebuttal. Thank you, counsel. Counsel for advocate. May I proceed? Yes. May it please the court, Jill Vorobiev on behalf of the Applee Advocate Health and Hospitals Corporation. I'm happy to address the issue of employer liability as we discussed first of all, your honors. We do believe Is there a genuine issue of fact, material fact, as to whether Aramark was an agent of advocate? Is it a material fact? Was that your question? I'm sorry. I say, is there a genuine issue of material fact as to whether Aramark was an agent of advocate? Well, we, your honor, we don't necessarily believe that. We believe that the, if you look at the services agreement itself, it specifically states that Aramark is an independent contractor to advocate. I think no one disputed in the record that Aramark was free to control the management and supervision of the department in terms of the day-to-day activities of the department and advocate did not exert control over Aramark to that extent. They were managing the associates. They were ordering supplies. They were distributing work assignments. Ultimately, under the services agreement though, advocate was ultimately responsible for those employees for discipline, for hiring, firing. Those Aramark, those advocate associates, they were hired by advocate. They were fired by advocate. They went to human resources with respect to complaints that they had in relation to their employment. Their discipline was reviewed in all cases and nobody but advocate could hire or fire them. Plaintiffs even concede in their brief that promotions were determined by advocate. Compensation was set by advocate at the beginning of the relationship. So we don't believe that there was any... I just don't think what they've conceded or not conceded makes a difference to look at what was actually happening here. Well, advocate had no authority to hire, to promote, or to discipline Aramark personnel. While advocate could request the removal of a director from Aramark, by no means could advocate terminate the employment of any Aramark individuals. Aramark was responsible for the salaries, the payroll taxes, all the decisions affecting their employment. So counsel, this is a real puzzle here to me as to whether the Vance standard even applies. Because I have never seen a situation like this where top management is the employer advocate, line employees are advocate, the employees of that employer, and you seem to have completely delegated at least three different levels of middle management to an independent contractor, agent, who knows what we call them. But it's difficult to see why advocate, having bestowed that much authority on three levels of middle management, should not be held accountable for their actions. And I think it's a two-fold inquiry. In light of this court's decision recently in Stratosphere, which looked at whether an employee of another entity could be considered almost a joint employer of the entity that employed the individual who sued, the court in that case said that because that individual reported to Stratosphere in that case, they were hired by Stratosphere, Stratosphere paid for their salary, paid for their benefits. If complaints were raised that an employee was instructed to go to Stratosphere, their employment was governed by the terms and conditions of employment of Stratosphere. Now, at the end of the day, the advocate, again, is the only one who could hire or fire these associates and had complete control over those most aspects of their employment decisions. It is a somewhat unusual situation. Companies should be free to hire independent contractors to come... Of course you're free to do so. The question is, with what legal consequences and with what levels of insulation for responsibility of the folks who are actually managing your employees on a day-to-day basis. Yes, and there was some... And I use that word not in a legal sense, but there were certainly some management responsibilities that those Aramark managers carried out, such as formulating schedules, sometimes directing day-to-day activities of those associates as part of carrying out their management duties and responsibilities. However, the Aramark Services Agreement specifically says that those advocate associates were never to be deemed employees of Aramark and that advocate ultimately retained control and authority over the significant decision... decisions affecting those associates' employment. So they were advocate associates, advocate contracted with a company that's very experienced in... You know, Aramark came in and they reestablished certain standards in the department, they created a lot of efficiencies, they standardized them... I will... I will just say this. I don't know what, you know, you all signed there, but it sure sounds, um, like they were coterminous. I'd like to, um, talk to you about my favorite subject, hearsay. Um, I'm confused about some of your claims about the admissibility of evidence. On pages 22 to 23 of your brief, you talk about comments made out of the presence of the plaintiff and sworn to by non-plaintiffs and affidavits. What I was wondering is, why is that hearsay evidence? Um, specifically in this case, a non-plaintiff, um, affion, uh, attests in an affidavit that she heard a supervisor call another employee a derogatory term. Now, no one is trying to prove the truth of the statement. For example, that statement that Polish people, uh, clean better than black people or whatever the statement was. Rather, the statement is being used to demonstrate the nature of the work environment. And the affiant has personal knowledge of it. Um, why isn't, uh, that admissible? You know, there are two different forms of testimony by non-party employees. So one is that I myself heard a supervisor say something racist. Uh, or someone else told me, or the word on the street is that a supervisor made a racist statement. Which kind of hearsay are you referring to? I guess the problem that we had with the Carpintero Declaration was that it was very, uh, light in terms of content or specifics. What was it lacking? What the statement stated was that he had personal knowledge of her making the comment. He didn't say who was president. He didn't say he specifically heard the statement. And so there's been a lot of, as we talked about earlier, rumor and innuendo about these comments made. And without any sort of specifics as to how he became personally aware, he never said he heard it. He never said when he heard it. He never said if anyone else was president. And so we didn't believe that was sufficient to establish, um, enough information to indicate that, in fact, it was a statement that he heard. And frankly, one of the other plaintiffs, uh, Annette Smith, she testified that she heard another associate say that another associate had told her that Susan Castillo made that comment to her. So we believe that that is hearsay as well, if in fact not double hearsay. So there were not... The only direct evidence that Susan Castillo made a comment about a monkey was in the presence of one of the plaintiffs, Warren Johnson. He never reported that comment to management, and there's no indication in the record that anyone else specifically heard it or the circumstances under which they did hear it. Can I ask you about, um, another statement that doesn't seem to present any problems with respect to hearsay, uh, or aramark? And that is Mr. Johnson's testimony about what he heard Ms. DeYoung say. Yes. Um, if I recall, the testimony was that he heard her say it was harder to get Blacks who worked there to get them out of the hospital. She preferred Polish. They clean better. That was the initial statement. He later makes clear that was DeYoung. She's the vice president. And when I've tried to map this out, she's at the peak of all the folks we hear about, and she's an advocate vice president. That's admissible, right? Pardon me? That is admissible, correct? So, that- that could be admissible, certainly. That is admissible, potentially. What I will note is that they did not raise that comment on appeal as a basis for, uh, the reasons- one of the reasons they wanted this court to overturn that decision, first of all, so we would submit that they waived that evidence on this appeal. Second of all, there's no indication separate apart from the comment that she's involved- Are you saying they have to raise every single comment that might have been made? I- I think that- Is that- I think it's- Is that your- I'm sorry. I think it's their burden to come forward with evidence that they think is- is- is compelling and sufficient and important to have this decision overturned. The district court considered the comment. We believe that there's no indication that Ms. DeYoung was involved in any of the decisions affecting the employment and there's no evidence in the record to that- She ran this whole department, right? She's responsible for the working conditions. You've told us that, uh, uh, the- the- ad- these are advocate employees. Certainly. Advocate managers who work for Ms. DeYoung make the decisions if she doesn't make them personally, uh, about hiring, firing, pay raises, promotions, et cetera, right? Right. Well, there's no indication that she herself was specifically involved in the decisions affecting these individual plaintiffs. So if you have a comment and setting aside the egregiousness of the comment, there's some precedent from this court that not one comment is sufficient necessarily to establish race discrimination or harassment. It has to be somehow connected to the decisions at issue and- Okay, we have direct non-hearsay evidence attributing a racist attitude accurately or not but that's- that's for trial to the person in charge of this whole department for advocate. Are we supposed to ignore that? I- I think it needs to be- there are comments that come up in these cases and this court has addressed comments and they've looked at whether those comments are close in time to decisions that are being made. Does it- Does it- Does it make it different? You want us to treat this as a stray remark from the vice president of the whole department? I- I think in the context of a whole- Yes, your honor because there's no indication- And you want us to- Do you want us then to carve up that little box of evidence and ignore all of the evidence about the Aramark supervisors who are exhibiting racial bias and hostility and just treat those as separate boxes of evidence? Well, I- I don't necessarily think they need to be treated as separate boxes but I think they need to be looked at in the context of when they were made, how they were made, how they influenced any decisions affecting their emplo- the particular employees. So in the case of- So as far as evidence in a race discrimination case   if one supervisor makes the racist comment and a different supervisor takes the adverse employment action? I think that's what we need to do and I think that's what I heard you saying just now. I- I think under federal law there has to be a nexus between and this court has- Well, what could be a bigger nexus? Well, if she's not- if she's not involved in the decisions affecting the terminations of these individuals and her comments had no real bearing and there's no evidence in the record- Oh my, isn't that something to decide at trial? Well, I- I think there's- there are plenty of summary judgment cases that have been affirmed by this court where the court has said straight remarks by non-decision makers that are unrelated to the decisions at issue are not- are appropriate to resolve on summary judgment. I do believe that, Your Honor. Let me suggest a different way of looking at that which is very generous to the plaintiffs but we have to be on summary judgment which is the person in charge of this entire department exhibits racist attitudes there is direct evidence not all of it is hearsay direct evidence of disparate treatment with respect to working assignments obviously there's a lot of controversy about that I know that but again it's on summary judgment which you saw and we have plenty of direct non-hearsay evidence attributing racial racially hostile attitudes towards Aramark supervisors empowered by Ms. DeYoung under the advocate contract I would say Your Honor that there's no evidence linking Ms. DeYoung in particular to these decisions and so the testimony shows that the Aramark leaders were monitoring the performance of the associates in the department and then when decisions were made with respect to their employment they went to advocates human resources department would review those decisions review them against other decisions that had been made with comparable employees and review and approve those decisions there's no evidence in the record that it was Ms. DeYoung in fact who was making those decisions or weighing in on them she was a very high level person in the organization and the day to day terminations for unauthorized breaks or you know showing up not cleaning rooms properly there's no evidence in the record that she was involved in making those decisions or directing those decisions absent any sort of evidence on that fact I do believe that advocates role was limited and that's what the evidence in the record shows to human resources looking at those decisions and making those decisions not Ms. DeYoung there's no evidence to that how many people does Ms. DeYoung supervise so she's no longer an advocate but what I will say is that she she was on the executive leadership team and she had more of kind of an oversight of the department and she had some responsibilities with respect to the relationship with Aramark in terms of making sure that generally contractual obligations were being filled may I ask the question again how many including advocate if you want to break it out between advocate and Aramark that's fine we would take the position that she was not supervising Aramark because Aramark was supervised by their own people can you answer my question I don't have an answer a thousand a hundred twenty direct reports she had no she's the vice president of the entire EVS department how many people work in that department she also had responsibility for other departments that's why I'm struggling a little bit so she okay let's just take this give me an answer there were a few hundred associates in the EVS department thank you and okay anything else no not on that question are you familiar you've you've invoked our stray remarks lines of cases are you familiar with our recent decision in McKinney vs. Whitley County which deals with the tension between stray remarks and the same actor inference yes your honor anything you want to answer I understand there's a difference between same actor in terms of that individual hired or fired the person so I understand that no longer is a presumption or something that should be decided on summary judgment not necessarily based on the court's recent precedent what I do believe though that we've raised this in our briefs as well when some of the same decision makers are of the same race or the individuals involved in making decisions with respect to individuals are of the same race there is a presumption or an inference that can be drawn that they necessarily would be discriminated I think those cases are still standing on summary judgment which cases are you referring to as I can tell and I have them I do have them  can bear with me one minute we do cite some in our brief so you want us to decide this case on the theory that a woman cannot discriminate against women and blacks cannot discriminate against blacks I believe there's an inference that this court has that courts have recognized in this district I don't think it's presumptive necessarily but I do think there can be an inference that is drawn it's positive I should say outrageous to be honest with you it's clear there are many reasons why an African American supervisor might treat members of her own race more poorly than white workers I reject the assumption that African American supervisors are more or less likely to be wrong I think your honor with the cases some of the northern district of Illinois cases state is that there can be no compelling inference I'm sorry we are the US court of appeals yes and there was a case recently Bates vs. City of Chicago in 2013 from this court and this court specifically said that although it is possible as you stated your honor for employers to discriminate against members of their own race there was no evidence in that case of one African American supervisor treating another one that was that case that was this case no right that was this case but I think in the context of the whole in a department where the majority of the associates are African American associates where two of the plaintiffs in this case are at the highest paid in their department where where do we have that evidence that's evidence that we submitted in a declaration from Ronnie Anderson who is in charge of compensation issues that advocate three of the plaintiffs actually in this department three of the plaintiffs were the highest paid individuals in this department and while we mentioned that exhibit earlier in the case that had some other names on that some of the other higher paid associates on that exhibit in fact also were African American associates and so do you want us to look at that exhibit? We only submitted it in rebuttal to their claim it doesn't it helps our position so we don't have a problem with you looking at it. You submitted the exhibit that I was giving plaintiffs counsel a hard time about? They submitted it to show that there were other individuals who were higher paid. We look back at the race of some of those individuals there was a point in time when advocate there was some change in the pay scale and so some people who were already higher than the pay scale just remained at that level based on other positions that they had been in and so they challenged some of the salaries and we submitted evidence that there were both African-American associates and white associates who were above the pay scale in these limited situations based on some changes that had happened in advocates so we don't have a problem with you looking at it we just wanted to explain that we didn't believe that it helped the plaintiff's case. Thank you. I'll just say one more thing because you did not make that argument the question that I raised about the substantial number of black people who are decision makers and I don't think that that was a good argument but I don't think that it was a good argument but I don't think that it was a good argument but I don't  that it was a  argument but   your time and thank you for the opportunity to be here with you and thank you. Thank you. Thank you for   Courtesy of the plaintiff here. Sherry Young is doing well. Robert Pannel has been disciplined. He's offered a promotion. He's on top of pay scales. To suggest there is rampant race discrimination in the department. Is that all in the record? Are you outside the record now? Yes. Thank you counsel. Is there no further questions? Yes, it's in the record. Oh, okay, thank you. Thank you counsel. Ms. Kaczerwicz, rebuttal? How much time? Make it three. Real briefly, I would just like to reiterate a point that the reason that Aramark was not sued here is because Title 7 prohibits discrimination by employers. The plaintiff's employer here is without a question advocate. And that is why advocate was sued in this case. And Aramark and the leaders of Aramark such as language and comments that we've been talking about and that counsel has also touched on the fact that one of these racially offensive comments comes from the head of the EVS department paints a pretty clear picture here of the kind of hostile work environment the plaintiffs worked in. And I would like to draw this court's attention to the Rogers versus Western Southern insurance company where this court held that perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously equally unambiguously racial epithet of porch monkey which is probably just as egregious as the N word. In Rogers oddly these facts are very similar to the facts here. In Rogers the harasser, the manager made a comment that black guys are too down to be insurance agent. And he also made a comment about not wanting to hire any more blacks. Okay. And what this court held was that Title 7 prohibits blanket criticisms of a class of employees solely on the base of their race. Those are exactly the kinds of comments we have here. We have Susan Castillo saying that she doesn't want to hire blacks because they're lazy and because Polish people clean better. And she's saying that she's right. Lazy and she doesn't want to. It's the same kind of blanket criticisms that Title 7 prohibits. And it is an issue of fact. The case will be taken under advisement thanks to both counsel and we will take a 10 minute recess before moving on to the machinists against Allen.